UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LATISHA MONIQUE WILLIAMS CASON,    :
                                   :CIVIL ACTION NO. 3:15-CV-1070
          Plaintiff,               :
                                   :(JUDGE CONABOY)
          v.                       :
                                   :
CAROLYN W. COLVIN,                 :
Acting Commissioner of             :
Social Security,                   :
                                   :
          Defendant.               :
                                   :
_____

**MEMORANDUM**

Here we consider Plaintiff's appeal from the Commissioner's denial of Plaintiff's Title II claim for child's insurance benefits based on disability and Title XVI claim for Supplemental Security Income ("SSI").  (R. 15.)  Plaintiff filed for child's disability on September 11, 2012, and for adult SSI benefits on September 21, 2012.  (R. 15.)  Plaintiff, who turned eighteen on November 4, 2008, alleged disability beginning on August 7, 1998.  (R. 15, 21.)  In her December 17, 2013, Decision, Administrative Law Judge ("ALJ") Therese A. Hardiman concluded that Plaintiff had the following severe impairments: left eye blindness, arachnoid cyst, neurofibromatosis, optic atrophy, depressive disorder, major depressive disorder, anxiety, ADD/ADHD, learning disability and migraines.  (R. 17.)  She also found that Plaintiff had been diagnosed/evaluated for and/or treated for multiple non-severe impairments including carpal tunnel syndrome/Guyon tunnel syndrome, lower extremity sensory polyneuropathy, cervical radiculopathy,

lumbar, thoracic and cervical degenerative disc disease/degenerative joint disease, seizures, and dizziness. (R. 18.) ALJ Hardiman said that she reviewed all the severe and non-severe impairments in formulating Plaintiff's residual functional capacity ("RFC"). (R. 19.) The ALJ concluded Plaintiff had the RFC to perform a full range of work at all exertional levels but with certain non-exertional limitations. (R. 21.) She also concluded there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, and she was, therefore, not disabled from August 7, 1998, though the date of the decision. (R. 28.)

With this action, Plaintiff argues that the decision of the Social Security Administration is error for the following reasons: 1) the ALJ found Plaintiff's bilateral carpal tunnel syndrome/Guyon Tunnell syndrome, cervical radiculopathy, and polyneuropathy non-severe, and thus significantly overestimated her RFC; 2) the ALJ failed to assign any significant weight to the treating psychiatrist's opinion; 3) the ALJ failed to assign any significant weight to the treating neurologist's opinions; and 4) the ALJ failed to present a hypothetical question containing all of Plaintiff's credibly established limitations. (Doc. 11 at 3-4.) For the reasons discussed below, I conclude this matter is properly remanded.

## I. Background

### A.  *Procedural Background*

As noted above, Plaintiff filed for child's disability on September 11, 2012, and for adult SSI benefits on September 21, 2012. (R. 15.) Plaintiff, who turned eighteen on November 4, 2008, alleged disability beginning on August 7, 1998. (R. 15, 21.) Following the November 5, 2012, initial unfavorable decision (R. 102-19), Plaintiff filed a request for a hearing on December 5, 2012 (R. 15). Plaintiff appeared and testified at a hearing held on October 27, 2013, before ALJ Hardiman. (*Id.*) Plaintiff's grandmother with whom she lives, Christina Rivera Cason, also testified. (*Id.*) Plaintiff was represented by an attorney, Joseph Rattman, and Fran Terry, a vocational expert ("VE"), testified. (*Id.*) ALJ Hardiman issued her unfavorable Decision on December 17, 2013. (R. 15.) Plaintiff requested a review of the decision on February 19, 2014. (R. 6.) The Appeals Council denied the request on March 31, 2015, thereby making the ALJ's decision the final decision of the Acting Commissioner. (R. 1-5.)

Plaintiff filed this action on May 29, 2015. (Doc. 1.) Defendant filed her Answer (Doc. 7) and Social Security Administration Transcript (Doc. 8) on August 20, 2015. Plaintiff filed his supporting brief on November 10, 2015. (Doc. 11.) Defendant filed her opposition brief on December 12, 2015. (Doc. 12.) Plaintiff filed his reply brief (Doc. 15) on January 11, 2015, after having requested and been granted an extension of time within which to do so (Docs. 13, 14). Therefore this matter is fully briefed and ripe for disposition.

3

**B.    *Factual Background***

**1.    Impairment Evidence**

The following review of evidence of record focuses on evidence relevant to our discussion of Plaintiff's claimed errors. The relevant time period for Plaintiff's Title II child's disability claim is from her eighteenth birthday-- November 4, 2008--to the age of twenty-two or November 4, 2012.  (R. 22.)  The relevant time period for her SSI claim is from her protective filing date of September 21, 2012, to the date of the ALJ decision--December 17, 2013.  (*Id.*)

*a.    Physical Impairments*

i.    Primary Care Treatment

Records indicate that Solibe Ufondu, M.D., was Plaintiff's primary care physician.  (R. 718-38.)  Plaintiff saw Dr. Ufondu on nine occasions between August 29, 2008, and October 10, 2012, primarily for routine primary care matters.  (*Id.*)  Dr. Ufondu noted throughout that Plaintiff's medical history was significant for Neurofibromatosis, ADHD, and allergy.  (R. 721, 723, 725, 727, 729, 731, 733, 735, 737.)  In August 2008, Plaintiff was taking Concerta for her ADHD, but she stopped taking it in September 2009.  (R. 727, 733.)  In July 2012, the only medication Plaintiff was taking was Claritin but Dr. Ufondu started her on Concerta again.  (R. 725.)  At that visit, Dr. Ufondu noted that Plaintiff had an

orbital tumor for which she had seen a doctor in New York.[1]  (*Id.*)
He also noted that Plaintiff complained of headaches and said she
had been seen in the emergency room for bloody stool.  (*Id.*)  He
referred Plaintiff to Charles Cohan for the GI bleed, to Dr.
Levinson for ADHD, to Dr. Shields in Philadelphia, and to James
Kerrigan for the "Neurofibromatosis/Eye Tumor."  (*Id.*)

On September 19, 2012, Plaintiff saw Dr. Ufondu complaining of
constipation for the preceding five months and dizziness which
worsened when she changed positions.  (R. 723.)  Dr. Ufondu ordered
labs for the constipation and again referred Plaintiff to Dr.
Cohan; he referred Plaintiff to Matt Vegari for assessment related
to "Neurofibromatosis/Brain Tumor," and ordered labs for anemia,
malaise and fatigue.  (R. 723-24.)

On October 10, 2012, Plaintiff complained to Dr. Ufondu of
trouble sleeping, sweaty palms, anxiety for the preceding two
months, headache, and dizziness.  (R. 721.)  Dr. Ufondu noted that

---

[1] Dr. Ufondu noted that Plaintiff had Type I
Neurofibromatosis.  (R. 725.) Neurofibromatosis is a generic
disorder that disturbs cell growth in the nervous system, causing
generally benign tumors to form on nerve tissue.
http://www.mayoclinic.org/diseases-
conditions/neurofibromatosis/basics/definitions.  People with
neurofibromatosis often experience only mild symptoms.  *Id.*  Type I
usually appears in childhood with signs and symptoms that can
include harmless flat light brown spots on the skin ("café au lait
spots"), neurofibromas (benign tumors that can be located anywhere
in the body), Lisch nodules (tiny harmless bumps on the iris of the
eye), bone deformities such as scoliosis or bowed lower leg, and
learning disabilities which are usually mild.
http://www.mayoclinic.org/diseases-
conditions/neurofibromatosis/basics/symptoms.

Plaintiff was seeing a psychiatrist at the time and he advised her to follow up with the psychiatrist. (*Id.*) He noted that Plaintiff had stopped taking Concerta on September 26, 2012, and was only taking Claritin at the time. (*Id.*)

ii.  Carpal Tunnel Syndrome/Guyon Tunnel Syndrome, Cervical Radiculopathy, and Polyneuropathy

Plaintiff saw neurologist Matt Vegari, M.D., for an initial visit on September 27, 2012. (R. 709.) He recorded the following history:

> Latisha is a 21 year old right handed patient who is in for an initial visit. About 4 weeks ago her vision went black and she passed out and remembers she started shaking. She was extremely fatigued afterwards. She admits to wetting the bed a few nights ago. She does have strange smells but no strange tastes. She states her cheeks are sore after waking up at times like she was biting them in her sleep. She states she was using the computer one time and she woke up but did not know she fell asleep. She states her vision goes black and she feels like she is going to pass out but did not. She has been having frequent headaches at least 3-4 a week that usually occur throughout her head. She states that she gets a "sharp" pain behind her left eye. She states she has a tumor behind her left eye that she has had since she was about 5 years old. She has been having memory loss for about a year now. She has neck pain that radiates into her upper extremities bilaterally with parasthesias. She has no family history of seizures.

(R. 709.) Physical examination showed the following: left lower facial weakness; motor strength diminished as to handgrip at 4+, intrinsic hand muscle weakness 4+, and right brachiordialis

weakenss at 4+; biceps, triceps, brachioradialis, and patellar reflexes were diminished on the right side; ankle jerk was 2/4 right and left; and Tinel's and Phalen's were bilaterally positive; the cervical spine showed mild cervical paraspinal muscle spasm, limitation of neck movement to both horizontal planes, cervical and trapezius muscle spasm right much worse than left, 30 degrees left lateral rotation, 20 degrees right lateral rotation, facet tenderness at C3-4 and C4-5, and multilevel cervical root tenderness; and the thoracic spine showed thoracic paraspinal muscle spasm and tenderness, mild thoracolumbar scoliosis, and facet tenderness T5-6 and T6-7.  (R. 710.)  Dr. Vegari recorded the following assessment: 1) Localization-related (focal) (partial) epilepsy and epileptic syndromes with complex partial seizures, with intractable epilepsy; 2) Neurofibromatosis, unspecified; 3) Neurofibromatosis, Type 2 (acoustic neurofibromatosis)[2]; 4) Migraine without aura; 5) Benign neoplasm of brain (rule out 3rd ventricular lesion); 6) Intervertebral cervical disc disorder with myelopathy, cervical region; 7) Carpal tunnel syndrome; 8)

---

[2] Neurofibromatosis, Type 2, is much less common that Type 1 and signs and symptoms usually result in the development of vestibular schwannomas, benign tumors, in both ears.  In some cases, Type 2 can lead to growth of schwannomas in other nerves of the body including the cranial, spinal, visual (optic) and peripheral nerves.  Associated signs and symptoms may include facial drop, numbness and weakness in the arms or legs, pain, and balance difficulties.  In addition, Type 2 may result in vision problems due to abnormal growth on the retina or due to the development of cataracts.  http://www.mayoclinic.org/diseases-conditions/neurofibromatosis/basics/symptoms.

Intervertebral thoracic disc disorder with myelopathy, thoracic region; 9) Other disorder of optic nerve; and 10) Concussion, with loss of consciousness of thirty minutes or less.  (R. 711.)  He planned the following diagnostics: an EEG regarding epilepsy; MRI of the cervical spine for cervical region problems; and brain MRI for the concussion. (*Id.*)  Dr. Vegari also advised Plaintiff that she could not drive for up to six months and she should not drive her Go-Kart.  (*Id.*)

An October 5, 2012, MRI of the cervical spine ordered by Dr. Vegari showed straightening of normal cervical lordosis compatible with muscle spasm.  (R. 712.)  No disk bulge or herniation was seen.  (*Id.*)

Dr. Vegari reported that the October 5, 2012, EMG of the upper extremities, was abnormal.  (R. 714.)  He noted it was most consistent with the following: left C5 root irritation acute in nature; bilateral median motor and sensory peripheral neuropathy primarily demyelinating in nature across both wrists, consistent with bilateral carpal tunnel syndrome; and bilateral ulnar motor and sensory peripheral neuropathy primarily demyelinating in nature across both wrists, consistent with Guyon's tunnel syndrome.  (*Id.*)

Plaintiff saw Dr. Vegari again on November 7, 2012.  (R. 785.) Plaintiff reported that she had been having three to four headaches a week, a sharp pain behind her left eye, memory loss over the preceding year, and neck pain that radiated into her upper

extremities bilaterally with paresthesias.  (*Id.*)  Dr. Vegari noted that the brain MRI showed some prominent CSS space anterior to the left middle fossa indicating a small Arachnoid cyst within the left middle fossa and also showed Retention cyst in the left maxillary sinus.  (*Id.*)  Examination showed basically the same problems as those identified at Plaintiff's September 27, 2012, visit.  (R. 710, 785-86.)  Dr. Vegari's assessment also remained the same.  (R. 711, 786.)  Dr. Vegari ordered an EEG related to her epilepsy, he planned to refer her to a neurosurgeon at Lehigh Valley Hospital for the left eye problem related to her neurofibromatosis, and he ordered bilateral hand braces to be worn at night and with repetitive movements for the carpal tunnel syndrome.  (R. 785-86.)

Plaintiff saw Dr. Vegari's physician's assistant, Amanda Beck, for follow up on January 21, 2013.  (R. 782.)  In notes signed by Dr. Vegari, Ms. Beck recorded that Plaintiff would be seeing a neurosurgeon at St. Luke's Hospital and reported the following: episodes of dizziness and lightheadedness; headaches three to four times a week which were accompanied by nausea and sensitivity to light and sound; paresthesias in her arms bilaterally; neck pain that radiated into her upper extremities bilaterally with paresthesias; and mid-back pain between her shoulder blades.  (*Id.*)  Dr. Vegari recorded the following diagnostic results:

> MRI of the brain showed no acute abnormality.
> Stable left middle cranial fossa and
> intrasellar mass likely representing an
> arachnoid cyst.  The left orbit wall is
> deformed laterally resulting in proptosis and

9

> narrowing of the optic canal.  MRI of the
> orbits advised.  Diffusion weighting also
> advised to exclude any possibility of a
> dermoid cyst.  Ambulatory EEG was abnormal
> for electrographic seizures.

(R. 782.)  Examination showed that Plaintiff continued to have

cervical paraspinal muscle spasm and limitation of neck movement,

multilevel cervical root tenderness, thoracic spinal muscle spasm,

and motor and reflex limitations as noted at previous visits

including positive Tinal and Phalen sign bilaterally.  (R. 782-83.)

Examination of the lumbar spine showed problems not previously

noted--moderate lumbosacral paraspinal muscle spasm and lower

lumbar facet tenderness.  (R. 783.)  Dr. Vegari's plan was to start

medication for the localization-related epilepsy due to

abnormalities found on the EEG; see a neurosurgeon at St. Luke's

for the Neurofibromatosis, unspecified, Neurofibromatosis, Type 2,

and optic nerve disorder; order MRI of the orbit, face, and neck

for the Neurofibromatosis, Type 2, and optic nerve disorder due to

abnormality found on MRI of the brain; order MRI and EMG/NCV based

on the lumbar spine examination findings; and continue the use of

wrist splints for the carpal tunnel syndrome.  (R. 783.)  Although

the "Medications" section of the notes indicated "none," the Plan

related to epilepsy medication indicated that Plaintiff was "on

multiple psychiatric medications."  (R. 782, 783.)

A February 11, 2013, EMG of both lower extremities indicated

"[b]ilateral peroneal and posterior tibial motor bilateral sural

sensory polyneuropathy of mixed demyelinating and axonal in

10

nature." (R. 788.)

A February 15, 2013, MRI of the lumbar spine showed evidence of mild multilevel disc dehydration. (R. 791.) The Impression was "[u]nremarkable study." (R. 791.)

Plaintiff again saw Ms. Beck on February 25, 2013. (R. 779.) Plaintiff reported she had been seeing a neurosurgeon at St. Luke's. (*Id.*) She also reported that she had no seizure activity since her last visit, she was getting daily headaches accompanied by nausea and sensitivity to light and sound, she continued to have radiating neck and upper back pain with related paresthesias. (*Id.*) Plaintiff was taking Lamictal, Fioricet, Zoloft, Ferrous Sulfate, and Tenex. (*Id.*) Examination and Assessment were similar to the month before. (R. 779-80.) The plan was for additional testing related to Plaintiff's epilepsy and physical therapy for her cervical and lumbar spine problems. (R. 780.) Ms. Beck noted that Plaintiff had not yet gotten the wrist splints. (*Id.*)

On May 31, 2013, Plaintiff was seen by Ms. Beck for a follow up visit. (R. 833.) Plaintiff continued to complain of daily headaches with the pain located on the left side of her head, and also radiating neck and back pain. (*Id.*) Physical therapy was ordered for Plaintiff's neck, back, and wrist problems and Plaintiff was to have ambulatory EEG monitoring for her epilepsy. (R. 834.)

At a June 4, 2013, physical therapy assessment with Raul M.

11

Tanguilig, PT, Plaintiff reported her neck pain at 5/10, her low
back pain 6/10, and wrist pain at 0/10. (R. 830.)  In general she
reported that her neck pain ranged from 2/10 to 8/10, her low back
pain ranged from 6/10 to 10/10, and her wrist pain ranged from 0/10
to 8/10.  (*Id.*)  She described the pain associated with each
problem, including the cramping of her fingers, numbness and
tingling in her hands and wrists, and dropping things associated
with the wrist pain which she said was aggravated by lifting heavy
things.  (*Id.*)  The plan was for Plaintiff to attend physical
therapy two to three times a week for six weeks and do a home
exercise program.  (R. 831.)

b.   *Mental Impairments*

     Benjamin Wowo, M.D., was Plaintiff's treating psychologist
beginning on December 28, 2012, when her grandmother brought her to
the clinic because of depressed mood and additional mental health
problems worsening over the preceding two months.  (R. 756.)
Reported symptoms included low energy, feelings of hopelessness and
worthlessness, inability to finish assigned tasks, short attention
span, and anxiety.  (*Id.*)  Plaintiff had previously taken ADHD
medications but had stopped two years earlier because of severe
headaches.  (*Id.*)  Dr. Wowo diagnosed major depressive disorder
with anxiety, and ADHD.  (R. 757.)  He started Plaintiff on
Sertraline for depression and anxiety, and Tenex for ADD.  (*Id.*)
She was directed to return to the clinic in one week for review of

12

her clinical improvement.  (*Id.*)

On January 4, 2013, Plaintiff reported to Dr. Wowo that she continued to have difficulties and had not noticed any improvement with the medications.  (R. 769.)

On May 8, 2013, Plaintiff said she came in to pick up the requested report but decided she wanted to get her meds refilled after having been off them for over one month.  (R. 770.) Plaintiff also reported continuing anxiety and depression.  (*Id.*) Dr. Wowo again started Plaintiff on medications and scheduled a two-week followup visit for clinical monitoring for efficacy and adverse effects.  (*Id.*)

On May 29, 2013, Plaintiff reported that she continued to have difficulties with concentration and focusing, and her depressive symptoms of depressed mood, low energy levels, and anhedonia continued.  (R. 835.)  Dr. Wowo increased the Tenex dosage to address the ADD symptoms and started Citalopram to address the depressive symptoms.  (*Id.*)

On June 11, 2013, Dr. Wowo recorded that Plaintiff was compliant with her medications but continued to report depressive symptoms.  (R. 836.)  He added Abilify to her medication regimen and directed Plaintiff to return in two weeks.  (*Id.*)

Plaintiff did not see Dr. Wowo again until October 2, 2013. (R. 837.)  Dr. Wowo's notes indicate some confusion as to medications Plaintiff was taking, and he stated that she had been

13

off her medications since the previous prescriptions ran out.
(*Id.*)  Dr. Wowo further noted that efficacy of her medications
could not be ascertained because of noncompliance.  (*Id.*)

In Dr. Vegari's May 31, 2013, Dizziness Medical Source
Statement, he indicated that associated mental problems were
depression, social isolation, poor self-esteem, and memory
problems.  (R. 777.)  The "Medications" section of the notes in the
Headaches Medical Source Statement (R. 771-74) indicated "none,"
but the Plan related to epilepsy medication indicated that
Plaintiff was "on multiple psychiatric medications" (R. 782, 783).

## 2. **Opinion Evidence**

On July 26, 2012, Dr. Ufondu completed a Pennsylvania
Department of Public Welfare Employability Assessment Form.  (R.
658-60.)  He checked a box indicating that Plaintiff was
permanently disabled.  (R. 660.)  His primary and secondary
diagnoses were ADHD and eye tumor.  (*Id.*)  The bases identified in
check-the-box form for the assessment were physical examination,
review of medical records, clinical history, and appropriate tests
and diagnostic procedures.  (*Id.*)

On July 27, 2012, Dr. Ufondu completed a Pennsylvania
Department of Public Welfare Health-Sustaining Medication
Assessment Form.  (R. 657.)  The primary diagnosis was ADHD and
secondary diagnosis was eye tumor.  (Id.)  The medication
identified as needed for Plaintiff to sustain employment was

14

Concerta and the reason Dr. Ufondu stated Plaintiff "could not work in any capacity without this medication" was "Pt. will die if she does not take meds." (R. 657.)

As set out in the Disability Determination Explanations, Marci Cloutier, Ph.D., opined on October 25, 2012, that Plaintiff's ADHD and anxiety were non-severe. (R. 105, 114.) She concluded that Plaintiff had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning and maintaining concentration, persistence or pace, and she had no repeated episodes of decompensation, each of extended duration. (*Id.*)

The Disability Determination Explanations also contained the RFC assessments of Elizabeth Kamenar, M.D., dated November 1, 2012. (R. 106-08, 115-17.) She opined that Plaintiff had the following exertional limitations: she could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; and she could stand, walk or sit for six hours in an eight-hour day. (R. 106, 115.) Regarding postural limitations, Dr. Kamenar found that Plaintiff could never climb ladders, ropes, or scaffolds, and she was limited to occasional climbing of ramps/stairs, and occasional balancing, stooping, kneeling, crouching and crawling. (R. 106-07, 115-16.) She also concluded Plaintiff had numerous environmental limitations. (R. 107, 116.) Dr. Kamenar indicated that the postural and environmental limitations were based on Plaintiff's

15

history of passing out.[3]  (*Id.*)

On May 13, 2013, Dr. Wowo completed a Mental Impairment Questionnaire.  (R. 763-68.)  He noted that she experienced dizziness and drowsiness as side effects of his medications and indicated that the severity of Plaintiff's major depressive disorder with anxiety and ADHD were demonstrated by constricted affect, difficulty sleeping, depressed mood, and impaired concentration.  (R. 763.)  Dr. Wowo opined that Plaintiff was unable to meet competitive standards in the following areas: remember work-like procedures; maintain attention for a two-hour segment; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and deal with normal work stress.  (R. 765.)  Dr. Wowo found that Plaintiff had "none-mild" restriction of activities of daily living; she had moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace; and she had one or two episodes of decompensation within a twelve month period, each of at least two weeks duration.  (R. 767.)  He concluded that Plaintiff had a

> [m]edically documented history of a chronic
> organic mental, schizophrenic, etc., or
> affective disorder of at least 2 years'
> duration that has caused more than a minimal

---

[3]  The RFC Assessment Form does not ask the consultant to explain a reason for the exertional limitations identified.  (*See* R. 106, 115.)

limitation of ability to do any basic work
activity, with symptoms or signs currently
attenuated by medication or psychosocial
support, and . . . the following: . . . A
residual disease process that has resulted in
marginal adjustment that even a minimal
increase in mental demands or change in the
environment would be predicted to cause the
individual to decompensate.

(R. 767.)  Dr. Wowo further concluded that Plaintiff's impairments

or treatment would cause her to be absent from work more than four

days per month and the impairment could be expected to last at

least twelve months.  (R. 768.)  As an additional reason that

Plaintiff would have difficulty working at a regular job on a

sustained basis Dr. Wowo noted that Plaintiff had a significant

medical problem that had not yet been fully evaluated.  (*Id.*)

On May 31, 2013, Dr. Vegari completed a  Dizziness Medical

Source Statement.  (R. 775-78.)  The record also contains an

undated Headaches Medical Source Statement.  (R. 771-74.)  Dr.

Vegari indicated that the dizziness occurred daily with headache

onset and lasts at least an hour.  (R. 775.)  He noted that

several symptoms were associated with the dizziness episodes

including nausea/vomiting, sensitivity to light and noise, fatigue

and exhaustion, falling, and post episode exhaustion and paranoia.

(R. 776.)  He opined that Plaintiff could not work at heights or

around power machines requiring an alert operator, and she could

not drive or take a bus alone.  (*Id.*)  Associated mental problems

identified were depression, social isolation, poor self-esteem, and

memory problems.  (R. 777.)  Dr. Vegari concluded that Plaintiff

17

could not tolerate even low stress work because the onset of the dizziness is unpredictable, she would often have to take unscheduled breaks during the work day, and she would be off task twenty-five percent of the time or more.  (*Id.*)  He also found Plaintiff's impairments as demonstrated by signs, clinical findings and laboratory or test results to be reasonably consistent with the symptoms and limitations he assessed.  (*Id.*)  The findings recorded in the Headaches Medical Assessment Source Statement were similar.  (R. 771-74.)  Dr. Vegari additionally noted that Plaintiff was incapable of even low stress work because the pain severity with the daily headaches which lasted for an hour or more caused a loss of function.  (R. 772.)  He stated that at times bending or outstretching arms could cause the onset of a headache as could noises or bright lights and it was unknown when they would occur or how long they would last.  (R.  774.)

**3.**   **Hearing Testimony**

At the hearing before the ALJ on October 22, 2013, Plaintiff's attorney asked her why she felt she was disabled from work.  (R. 74.)  Plaintiff responded that she had bad migraines, dizzy spells and seizures as well as problems with concentration.  (*Id.*, R. 85.)  She also testified that the migraine pills don't take away the headaches and sometimes they don't work at all.  (R. 70, 77.)  Plaintiff described the migraine pain as a sharp pain she feels in her eye stating that "[i]t feels like my eye is going to fall out."

18

(R. 77.)  She noted that her headaches started getting severe in the preceding year.  (R. 75.)  Plaintiff said that when she has a bad headache she closes her blinds, turns off the light and lies down.  (R. 71.)  She also said her symptoms could be either caused or aggravated by leaning too much, loud noises, and light.  (*Id.*) Plaintiff testified that she has a migraine three to four times a week and she gets other headaches in between.  (R. 77.)  Plaintiff said the dizziness was caused by the headaches and migraines and sometimes it followed nighttime seizures.  (R. 81.)  The dizziness made her feel like a room was spinning and she had to hold onto a wall.  (*Id.*)  She said that leaning down made it worse and the dizziness also made her nauseous.  (*Id.*)

Plaintiff also identified ADD and depression as problems, testifying that she still had symptoms when she took the medication for depression and her memory was bad as a result of the ADD.  (R. 70.)

Plaintiff explained that she had to leave Job Corps because she couldn't "keep up and concentrate" due in part to her headaches.  (R. 72.)  She also stated that she was told not to come back after working at Guess, a clothing store, for one day because she "wasn't doing, folding stuff right, and keeping up with the pace."  (R. 74.)

Plaintiff's grandmother, Christina Rivera Cason, confirmed the frequency and severity of Plaintiff's headaches and dizziness, noting that Plaintiff was unable to function when she had a

19

migraine.  (R. 94.)  She also confirmed Plaintiff's memory and concentration problems, citing examples of the difficulties she experienced.  (R. 94-95.)

**4.  ALJ Decision**

ALJ Hardiman made the following Findings of Fact and Conclusions of Law in her December 17, 2013, Decision.

1.  Born on November 4, 1990, the claimant had not attained age 22 as of August 7, 1998, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2.  The claimant has not engaged in substantial gainful activity since August 7, 1998, the alleged onset date (20 CFR 404.1571 et. seq., and 416.971 et seq.).

3.  The claimant has the following severe impairments: left eye blindness, arachnoid cyst, neurofibromatosis, optic atrophy, depressive disorder, major depressive disorder, anxiety, ADD/ADHD, learning disability and migraines (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She is limited to occasional climbing, balancing and stooping.  She could never climb ladders

and must avoid noise, vibration and hazards, including heights and moving machinery.  Due to the low vision in her left eye, there is no left far or near acuity, left depth perception and left visual fields.  However, the right eye has no limitations in any of these areas and is completely normal.  She is limited to simple routine tasks, low stress is defined as only occasional decision-making and only occasional changes in the work setting, and she is to have no interaction with the public.

6.  The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on November 4, 1990 and was 7 years old, which is defined as a younger individual, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from August 7, 1998, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

(R. 17-28.)

In determining Plaintiff's RFC, ALJ Hardiman reviewed the
medical evidence, noting in several instances the absence of the
necessary objective signs and laboratory findings to support her
alleged disability.  (*See*, *e.g.*, R. 25.)  She afforded little
weight to the opinions reviewed above, noting the lack of support
for the opinions rendered and internal inconsistencies in some
opinions.  (R. 26-27.)  Regarding consultant Dr. Elizabeth
Kamenar's opinions finding exertional limitations, ALJ Hardiman
stated that Dr. Kamenar did not set forth any signs or laboratory
findings to support the limitations.  (R. 26.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to
determine whether a claimant is disabled.[4]  It is necessary for the

---

[4]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less that 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that

Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 28.)

## III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely

deferential and becomes instead a sham.
*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v.*

25

*Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

26

# IV. Discussion

## A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

## B. Plaintiff's Alleged Errors

As set out above, Plaintiff alleges the following: 1) the ALJ found Plaintiff's bilateral carpal tunnel syndrome/Guyon Tunnell

syndrome, cervical radiculopathy, and polyneuropathy non-severe, and thus significantly overestimated her RFC; 2) the ALJ failed to assign any significant weight to the treating psychiatrist's opinion; 3) the ALJ failed to assign any significant weight to the treating neurologist's opinions; and 4) the ALJ failed to present a hypothetical question containing all of Plaintiff's credibly established limitations.  (Doc. 11 at 3-4.)

1.    **Step Two Consideration**

Plaintiff first asserts that the ALJ erred when she failed to find Plaintiff's carpal tunnel syndrome/Guyon tunnel syndrome, cervical radiculopathy, and polyneuropathy severe impairments, an error which resulted in the ALJ overestimating Plaintiff's RFC. (Doc. 11 at 5.)  Defendant maintains that the ALJ's step two analysis is supported by substantial evidence and whether the conditions were considered severe impairments at step two is irrelevant because the ALJ considered them at later steps of the sequential evaluation.  (Doc. 12 at 14, 16.)  I conclude that the ALJ's consideration of the impairments at issue is cause for remand.

Plaintiff notes that the regulations indicate that "an impairment is considered non-severe only 'if it does not significantly limit your physical or mental ability to do basic work activities.'" (Doc. 11 at 6 (quoting 20 C.F.R. § 404.1521).) Plaintiff cites SSR 85-28 for the proposition that this regulation has been interpreted to mean that "a non-severe impairment is a

28

slight abnormality or a combination of slight abnormalities that causes no more than minimal limitation in ability to function." (*Id.* (citing SSR 85-28; *Newell v. Commissioner of Social Security*, 347 F.3d 541, 546-47 (3d Cir. 2003)).) *Newell* advises that "[r]easonable doubts on severity are to be resolved in favor of the claimant." 347 F.3d at 547.

While Plaintiff may be correct that Plaintiff's carpal tunnel syndrome/Guyon tunnel syndrome, cervical radiculopathy, and polyneuropathy are well documented (Doc. 11 at 7-8), the question is whether they cause more than minimal limitation in her ability to function. The ALJ reviewed evidence of record regarding cervical, lumbar or thoracic impairments, including Dr. Vegari's physical examination findings, and concluded that the record did not contain the requisite longitudinal evidence that shows these impairments meet the durational requirements. (R. 18.) ALJ Hardiman made a similar finding regarding Plaintiff's carpal tunnel syndrome or Guyon tunnel syndrome, noting the objective supportive findings as well as the evidence that Plaintiff's sensation was reported to be normal and intact, her bilateral grip was 4+ out of 5/5, no range of motion deficits, normal upper motor strength and no objective deficits noted in her ability to perform fine and dextrous movements. (*Id.*)

I conclude that the record supports "reasonable doubts on severity," and the ALJ did not resolve them in favor of the claimant. *Newell*, 347 F.3d at 547. The review of evidence set out

above indicates that the impairments in question are established in the record.  The durational issue cited by ALJ Hardiman and relied upon in her non-severe determinations does not appear to take into account evidence supporting *ongoing* problems related to these impairments: Dr. Vegari's notes indicate objective examination findings on Plaintiff's first visit to him on September 27, 2012, included paraspinal muscle spasm, limitation of neck movement, cervical and trapezius muscle spasm, and thoracic paraspinal muscle spasm (R. 710-11); in October 2012, MRI of the cervical spine showed straightening of the cervical lordosis compatible with muscle spasm (R. 712) and EMG of the upper extremities was abnormal and consistent with the impairments found to be non-severe (R. 714); November 2012, January 2013, February 2013, and May 2013 examinations revealed limitations similar to those found previously (R. 782-83, 785-86, 833) with lumbosacral paraspinal spasm also found in January 2013 and thereafter (R. 783, 786, 833); physical therapy was ordered in May 2013 for Plaintiff's neck, back and wrist problems (R. 834); physical therapy examination showed some range of motion limitations as well as decreased strength of trunk muscles (R. 830-31).  ALJ Hardiman minimizes objective examination findings and assessments without sufficient explanation and does not address documented functional limitations regarding these impairments.  Her conclusion that durational requirements are not met does not address the "expected to last" consideration of 42 U.S.C. § 423(d)(1)(A), and Plaintiff's treating physicians have

given no indication that the problems at issue are of a finite duration.

Further, although the ALJ addresses the question of functional limitations related to the carpal tunnel syndrome/Guyon tunnel syndrome, her discussion is incomplete in that she does not discuss evidence supporting functional limitations such as Dr. Vegari's November 7, 2012, notation that he ordered bilateral hand braces to be worn at night and with repetitive movements for the carpal tunnel syndrome (R. 785-86), and his referral of Plaintiff to physical therapy to address wrist problems (R. 834). ALJ Hardiman does not mention Plaintiff's subjective reports to her physical therapist regarding symptoms and effects associated with the conditions at issue: Plaintiff reported numbness and tingling of both upper extremities associated with her intermittent neck pain which she said was aggravated by turning her head, lifting and looking up and down; regarding her intermittent low back pain, Plaintiff noted associated numbness and tingling of both lower extremities, low back spasm and difficulty controlling her legs and the pain was aggravated by bending her trunk, walking, lifting and sweeping; regarding wrist pain, Plaintiff stated that it was intermittent and aggravated by lifting heavy things and she had associated cramping of fingers, numbness and tingling of hands and wrists, and dropping things. (R. 830.) At the time of the physical therapy evaluation, Plaintiff rated her neck pain at 5/10, her low back pain at 6/10, and her wrist pain at 0/10. (*Id.*) In

general she reported that her neck pain ranged from 2/10 to 8/10, her low back pain ranged from 6/10 to 10/10, and her wrist pain ranged from 0/10 to 8/10.  (*Id.*)  Given the intermittent nature of Plaintiff's symptoms and functional limitations and the physician's verification of the impairments through physical examination and testing, the ALJ's minimization of the impairments at issue is not supported by substantial evidence particularly given the scant discussion of certain aspects of the record.  *Cotter*, 642 F.2d at 706-07 ("[A]n explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper.").

Given the conclusion that the ALJ's step two analysis of certain impairments is inadequate, the question remains whether this finding requires remand, or, as Defendant argues, is irrelevant because the ALJ considered these specific conditions at later steps of the sequential evaluation.  (Doc. 12 at 16.)  As noted by Defendant, this Court has concluded that error at step two may be harmless where the ALJ finds in the claimant's favor at step two and the non-severe impairment is considered at a later stage in the evaluation process.  (*Id.* at 16-17 (citing *Keys v. Colvin*, No. 3:14-CV-1913, 2015 WL 1275367, at *11 (M.D. Pa. Mar. 19, 2015)).)

Here the ALJ decided in Plaintiff's favor at step two, but a problem remains because the ALJ did not consider any limitations associated with the impairments in determining Plaintiff's RFC. ALJ Hardiman cites Dr. Vegari's October 2012 and January 2013

findings regarding cervical and lumbosacral spasms as well as bilateral carpal tunnel syndrome and bilateral Guyon's tunnel syndrome (R. 23), but she does not discuss any related deficits or limitations.  Because problems related to these conditions were significant enough to require physical therapy (R. 830-31) and involved limitations which could relate to Plaintiff's ability to engage in a full range of work at all exertional levels with no postural limitations, as ALJ Hardiman determined Plaintiff was able to do, lack of consideration of functional limitations related to these conditions is not consistent with her obligation to review all probative evidence.  Therefore, even if Plaintiff's claimed step two error were deemed harmless, error related to these conditions is present in the ALJ's RFC determination.  As this error is not harmless, it is cause for remand.

## 2.   **Treating Psychiatrist's Opinion**

Plaintiff next asserts that the ALJ erred in failing to assign great weight to the opinion of Benjamin Wowo, M.D., Plaintiff's treating psychiatrist.  (Doc. 11 at 10.)  Defendant argues that substantial evidence supports the ALJ's determination that Dr. Wowo's opinion was entitled to little weight.  (Doc. 12 at 17.)  I conclude that further consideration of the ALJ's assessment of Dr. Wowo's opinion is also warranted upon remand.

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight.  *See*, *e.g.*,

33

*Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20
C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d
Cir. 1981)).  The "treating physician rule," is codified at 20
C.F.R. 404.1527(c)(2), and is widely accepted in the Third Circuit.
*Mason v. Shalala*, 994 F.2d 1058 (3d Cir. 1993); *see also Dorf v.
Brown*, 794 F.2d 896 (3d Cir. 1986).  The regulation addresses the
weight to be given a treating source's opinion: "If we find that a
treating source's opinion on the issue(s) of the nature and
severity of your impairment(s) is well-supported by medically
acceptable clinical and laboratory diagnostic techniques and is not
inconsistent with the other substantial evidence in your case, we
will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).[5]  "A

---

[5] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from
> your treating sources, since these sources are
> likely to be the medical professionals most
> able to provide a detailed, longitudinal
> picture of your medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the
> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations. If we find that a treating
> source's opinion on the issue(s) of the nature
> and severity of your impairment(s) is well-
> supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not
> inconsistent with the other substantial
> evidence in your case record, we will give it
> controlling weight. When we do not give the
> treating source's opinion controlling weight,
> we apply the factors listed in paragraphs
> (c)(2)(i) and (c)(2)(ii) of this section, as

cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); see also *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The Court of Appeals for the Third Circuit addressed a plaintiff's argument that an ALJ failed to give controlling weight to the opinion of a treating physician in *Horst v. Commissioner of Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not precedential).

"Under applicable regulations and the law of

--------

well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> this Court, opinions of a claimant's treating
> physician are entitled to substantial and at
> times even controlling weight." *Fargnoli v.
> Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).
> Controlling weight is given when a treating
> physician's opinion is "well supported by
> medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent
> with the other substantial evidence."  20
> C.F.R. § 404.1527(d)(2).  "Although the ALJ
> may weigh the credibility of the evidence, he
> must give some indication of the evidence that
> he rejects and his reason(s) for discounting
> that evidence."  *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46.  *Horst* noted that neither the ALJ nor the court

needed to rely on the treating physician's opinion that the

plaintiff was completely disabled: "As an initial matter, 'the

ALJ--not treating or examining physicians or State agency

consultants--must make the ultimate disability and RFC

determinations."  551 F. App'x at 46 n.7 (quoting *Chandler v.

Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20

C.F.R. § 404.1527(d)).  Although it is true that an ALJ's

credibility judgments alone cannot override a treating physician's

medical opinion that is supported by the evidence, *Morales v.

Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon

more than personal observations and credibility determinations in

discounting the treating physician's finding of disability," the

ALJ does not run afoul of relevant law.  *Drejka v. Commissioner of

Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not

precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318

(3d Cir. 2000) (holding that an ALJ's credibility judgments alone

36

cannot override a treating physician's medical opinion that is supported by the evidence)). *Drejka* also noted that where the treating physician made the determination the plaintiff was disabled only in a form report, the Third Circuit Court has characterized such a form report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'" 61 F. App'x at 782 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

While ALJ Hardiman may have been entitled to assign limited weight to Dr. Wowo's check the box form, his mental status findings have not been "benign" as ALJ Hardiman concluded. (R. 26.) For example, on December 28, 2012, Dr. Wowo observed that Plaintiff was easily distracted, had difficulty finishing the questionnaire given to her, and had notable difficulties with immediate recall. (R. 757.) On January 4, 2013, Dr. Wowo noted that Plaintiff appeared sad and had a constricted affect. (R. 769.) Plaintiff was again noted to have a constricted affect with reported ongoing concentration and focus difficulties in May 2013. (R. 835.) In June 2013, Dr. Wowo noted that Plaintiff's affect was constricted and she continued to display depressive symptoms. (R. 836.) In October 2013, Dr. Wowo observed that Plaintiff appeared depressed with a constricted affect. (R. 837.)

ALJ Hardiman twice noted Plaintiff's lack of compliance with her medication regimen in her explanation of why she assigned little weight to Dr. Wowo's opinion. (R. 27-27.) Reference to a

claimant's noncompliance with treatment or medication may be used as a factor in analyzing credibility--"an ALJ may consider a claimant less credible if the individual fails to follow the prescribed treatment plan without good reasons."[6] *Vega v. Commissioner of Social Security*, 358 F. App'x 372, 375 (3d Cir. 2009) (not precedential) (citing SSR 96-7p).  However, here ALJ Hardiman does not explain how Plaintiff's lack of compliance affects the weight to which Dr. Wowo's opinion is entitled. Futhermore, any discussion of this issue should take into account the difficulties Plaintiff and her grandmother related to taking the medications prescribed: in January 2013, Plaintiff reported that she did not feel better on the medications prescribed in December and she had started having nightmares when she started the medications (R. 769); Plaintiff's grandmother reported that Plaintiff had become more hyperactive, rude, and nasty since she began taking the medications (*id.*); Plaintiff said she wanted to go back on the medications at her May 8, 2013, visit with Dr. Wowo (R. 770); and on May 29, 2013, Dr. Wowo noted that Plaintiff was compliant with her medications but she noticed that she was having more annoying dreams and was getting irritated more easily  (R.

---

[6] The Third Circuit Court of Appeals explained in *Vega* that "a denial of benefits for failure to follow a prescribed treatment plan may only be issued after the ALJ finds a disabling impairment that precludes engaging in any substantial activity, SSR 82-59." 358 F. App'x at 375.  The ALJ in *Vega* did not make such a finding nor did ALJ Hardiman.

835).  In October 2013, Plaintiff had again gone off her medications but Dr. Wowo noted that he would restart them with some modifications.  (R. 837.)

In addition to these problems with the ALJ's assessment, the relationship between Plaintiff's physical and mental problems should also be further considered upon remand, particularly because Dr. Wowo opined that possible biological contributors to her mental health problems could "include her medical problems (brain tumor)." (R. 757.)  Dr. Wowo also noted in the Mental Impairment Questionnaire that Plaintiff's "significant medical problem" would contribute to her difficulty working at a regular job on a sustained basis.  (R. 768.)

In sum, Dr. Wowo's opinion should be reevaluated because it is based on more than benign findings.  Further, because Dr. Wowo notes a  relationship between Plaintiff's mental and physical conditions, upon remand, this relationship should be further discussed in determining Plaintiff's RFC and ability to engage in gainful employment on a sustained basis.  Similarly, because Plaintiff reported side effects associated with her medications and their questionable effectiveness, noncompliance with her medication regimen should not be a reason to limit Dr. Wowo's opinion without further exploration and discussion.

### 3.   Treating Neurologist's Opinion

Plaintiff also maintains that the ALJ erred in failing to assign great weight to the opinions of treating neurologist Matt

Vegari, M.D.  (Doc. 11 at 14.)  Defendant asserts that substantial evidence supports the ALJ's assessment of Dr. Vegari's opinion. (Doc. 12 at 23.)  I conclude that further consideration of Dr. Vegari's opinions is warranted upon remand.

ALJ Hardiman said that she afforded the opinions little weight because they were provided on "check the box" forms completed in a handwriting which did not appear to be Dr. Vegari's, one of the statements was not dated, the forms did not have explanations for the conclusions or provide signs or laboratory findings to support the opinions, and the opinions were clearly not well supported on the face of the opinions, by Dr. Vegari's examination records, or the record as a whole.  (R. 26.)

This assessment is problematic for several reasons.  My conclusion that reevaluation is warranted is based in large part on the fact that Dr. Vegari treated Plaintiff over a period of time and, as can be seen in the records summarized above, regular headaches/migraines were routinely noted, as were associated problems such as dizziness, nausea and sensitivity to light and sound (*see*, *e.g.*, R. 782).  Pain and sensitivities associated with headaches can rarely be supported with laboratory findings, and therefore, rejection of the reported severity of a headache/migraine impairment should not be discounted on the basis of the lack of such findings, particularly where the reports of the frequency, severity, and associated symptoms are consistent throughout the record and are not inconsistent with other evidence

40

as is the case here when medical records, Plaintiff's testimony (*see*, *e.g.*, R. 76-79), and her grandmother's testimony are compared (*see*, *e.g.*, R. 94-95).  *See Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990) (citing *Baerga v. Richardson*, 500 F.2d 309, 312 (3d Cir. 1974) (for an ALJ to reject a claim of disabling pain, he must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record).  The fact that there may be different handwriting on a report is not relevant unless there is some indication that the physician signing the report neither participated in its completion nor reviewed and agreed with the matters addressed therein.  Here the ALJ provides no such indication.

These considerations indicate that further evaluation of Dr. Vegari's opinions are warranted.  They should be considered in the context of the record as a whole, including uncontradicted subjective complaints, and should only be discounted with a thorough analysis and explanation, including evidence which the ALJ finds contradictory.

**4.   Vocational Expert Questions**

Plaintiff's final asserted error is that the ALJ did not present all of her limitations to the vocational expert and, therefore, the answer was insufficient to carry Defendant's step five burden.  (Doc. 11 at 16.)  Extensive discussion of this claimed error is not necessary in that reevaluation of the evidence

and expert opinions is required upon remand.  The ALJ's decision to discount claimed limitations supported by Plaintiff's treating physicians and subjective complaints must be reevaluated. Therefore, the validity of her reliance on the VE's hypothetical must also be reviewed.

## V. Conclusion

For the reasons discussed above, this matter is properly remanded to the Acting Commissioner for further consideration.  An appropriate Order is filed simultaneously with this action.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: January 26, 2016